UNITED STATES BANKRUPTCY COURT

DISTRICT OF NEW MEXICO

In re:

STEVEN LEN HOWARD and                                    No. 14-11297 ta7
JUDY ANN PIMENTEL,

    Debtors.

## MEMORANDUM OPINION

Before the Court is the final fee application of debtor's Chapter 11 counsel. The United States Trustee's office objected to the application, arguing that counsel should not be paid for, inter alia, proposing two unconfirmable Chapter 11 plans. After a trial on the objection, the Court concludes the fees charged for the second plan and disclosure statement were not necessary and should be disallowed.

I.     Findings of Fact[1]

Steven Len Howard is a dentist; his wife Judy Ann Pimentel is a flight attendant who also helps out in his dental office. For many years, Dr. Howard operated a profitable periodontal practice, earning between $30,000-$50,000 per month. When she took all available flights, Mrs. Pimentel earned about $3,500-$4,000 a month.

Dr. Howard also generated income by buying, selling, and developing real estate. He is a licensed Realtor and Certified Commercial Investment Member, and considers himself an expert in commercial real estate. Prepetition, Dr. Howard formed the following single-member limited

---

[1] To the extent any finding of fact is construed as a conclusion of law, it is adopted as such, and vice versa. The Court may make additional findings of fact and conclusions of law as it deems appropriate or as may be requested by any of the parties.

liability companies ("LLCs") to buy, develop, and resell real property:

| LLC | Property owned | Lender: | Mortgage:[2] |
|---|---|---|---|
| La Cueva Properties | 8300 Carmel NE, Alb. (the "Carmel Building") | Wells Fargo | $980,000 |
| IF Group | 179 Howard Place, Las Cruces (the "Howard Building") | None | None |
| Progressive Dental | Lots 1, 2, & 3, Camino Coyote, Las Cruces (the "Lots") | Pioneer Bank ("Pioneer") | $302,000 |
| Templar Properties | 4151 Camino Coyote, Las Cruces | Pioneer | Not listed |
| Simon Properties | 190 Howard Place Las Cruces | First Financial Credit Union ("FFCU") | $1,212,351 |
| Simon Properties | 271 Paseo de Dia, Las Cruces | FFCU | $2,747,413 |

The properties were all purchased before the real estate downturn in late 2007.

Dr. Howard serviced the mortgage debt until 2013, when he began having financial trouble. To work out his difficulties, Dr. Howard proposed that FFCU accept interest-only payments until he completed a business transaction that would allow him to pay the FFCU debt. FFCU initially accepted the payments without reporting negative information to the credit bureaus. About four months later, however, FFCU appointed a new CEO who declined to honor the arrangement. In 2014, FFCU reported the late payments and filed a foreclosure action against Simon Properties and Dr. Howard as guarantor. One result was that Dr. Howard asserted he could not complete the transaction and pay FFCU. FFCU's change of position, inter alia, caused animosity between FFCU and Dr. Howard, which increased over time.

Debtors retained William F. Davis & Associates, P.C. (the "Firm") and filed this Chapter 11 case on April 29, 2014. They filed their bankruptcy schedules shortly thereafter. In Schedule

---

[2] These amounts reflect Debtors' representations in Exhibit J to the amended disclosure statement, p. 15 of 18. The lenders' claim amounts are now different, as several properties have been sold.

B, Debtors valued their interest in La Cueva Properties at $1,[3] IF Group at $90,000,[4] and Progressive Dental at $20,000.[5] The estimated property values upon which the LLCs were valued differed dramatically from previous estimates. In an April 2012 financial statement, for example, Dr. Howard valued the Carmel Building at $3,340,000 (not $980,000) and the Lots at $1,975,328 (not $330,000). Similarly, Debtors had listed the Howard Building for sale at $642,458 (not $90,000) within a year or so before the petition date.

FFCU held an unsecured claim of at least $1,166,276, which is about 59% of the unsecured claims pool.[6] Pioneer filed an unsecured claim in the amount of $96,000 (about 5% of the pool). Debtors and the Firm's lead attorney, William F. Davis ("Attorney") knew that unless FFCU's claim was substantially reduced for voting purposes, FFCU could control the unsecured creditor class and block confirmation.[7] There is nothing to indicate that a challenge to FFCU's claim would have been successful, so FFCU's acceptance was needed to confirm any Chapter 11 plan that paid less than 100% to unsecured creditors.

The first meeting of creditors was held on May 29, 2014. At the meeting, the United States Trustee ("UST") asked Debtors how they intended to confirm a plan over FFCU's opposition. Attorney indicated that he hoped the plan payments would be high enough to convince unsecured creditors to accept the plan. At the meeting, FFCU's counsel expressed concern about the scheduled values of the LLCs. Dr. Howard responded that the values were based on his estimates

---

[3] Based on an estimated value of the Carmel Building of about $980,000.
[4] Based on an estimated the value of the Howard Building of $90,000.
[5] Based on an estimated the value of the Lots of around $330,000.
[6] The claims register reflects $1,980,624 in unsecured claims.
[7] The absolute priority rule applies in individual Chapter 11 cases. *In re Stephens,* 704 F.3d 1279 (10th Cir. 2013); 11 U.S.C. § 1129(b)(2)(B)(ii).

and/or recent interest in the properties owned by the LLCs.

On June 17, 2014, FFCU's lawyer sent Attorney an e-mail reiterating his belief that Debtors materially undervalued the LLCs:

> Unless the Howards agree to properly value all properties and LLC interests to thereby reflect fair values for the LLC entities by amending their schedules, FFCU will seek appropriate relief through the U.S. Trustee and the bankruptcy court and will further contest any proposed Plan based on lack of fair market valuations.

Debtors filed a plan and disclosure statement on October 10, 2014, proposing to make 60 monthly plan payments of $3,000 each. After the payment of administrative claims, unsecured creditors were to receive about $156,000, or a 10% dividend. Debtors intended to fund the plan from future income and, if necessary, exempt retirement funds. The disclosure statement had the same LLC values as Schedule B. The plan allowed Debtors to retain the Carmel Building, the Howard Building, and the Lots.

A number of parties objected to the disclosure statement, including FFCU, Pioneer, and the UST. Most parties, particularly FFCU, complained that Debtors failed to properly value their LLCs. Pioneer asserted the plan violated the absolute priority rule, presumably because it did not require the liquidation of all non-exempt property. Debtors could not have confirmed their plan without the support of the unsecured creditors, and it was apparent that no such support would be forthcoming. Debtors decided not to pursue confirmation of the first plan.

Debtors filed an amended plan and disclosure statement on January 2, 2015. The amended plan was similar to the first plan, with two exceptions. First, the dividend to unsecured creditors was increased slightly, to about 14%. The monthly plan payments were still 60 payments of $3,000, but Debtors also promised to pay unsecured creditors at least $90,000 from the sale of real estate.

-4-

Second, Debtors proposed to list the Carmel Building, Howard Building, and Lots for sale and pay all net proceeds to unsecured creditors, under the following conditions:

- The Carmel Building would be listed for $1,175,000 or more; the Howard Building for $119,500 or more; and the Lots for at least $365,000;[8]
- Dr. Howard was to be the listing agent and would earn a commission on any sale;
- Debtors would only consider cash offers accompanied by a 20% earnest deposit;
- If the buyer failed to close within 15 days of court approval of the sale, they would forfeit their earnest money;
- Debtors shall have six months to vacate any sold property;
- Debtors have a right to match any offer, plus 5%; and
- If any property was not sold within 90 days, Debtors could remove the property from the market and keep it.

The amended disclosure statement reflected the same property values as before. Debtors hoped the amended plan would prompt serious negotiations with FFCU and other creditors, resulting in an agreed plan. Debtors were prepared to offer monthly plan payments of about $10,000 to obtain FFCU's vote. Attorney has a deserved reputation of being able to negotiate and settle with creditors in Chapter 11 cases.

FFCU objected, this time more vehemently, to the amended disclosure statement. FFCU reiterated its position the property values were too low, and asserted that the proposed sales arrangement was a *sub rosa* attempt to retain non-exempt equity in violation of the absolute priority rule. At trial, FFCU's counsel characterized the sales proposal as bankruptcy fraud. Pioneer joined in FFCU's objection. The New Mexico Taxation and Revenue Department also objected on, inter alia, absolute priority rule grounds.

---

[8] The proposed listing prices were low. For example, six months earlier Debtors rejected an offer to purchase the Howard Building for $500,000. Dr. Howard viewed the offer as more of an option contract because it contained some contingencies.

-5-

Because of the obvious problems with the property sales proposal and FFCU's aggressive stance throughout the case, the Court finds there was no chance unsecured creditors would have accepted the amended plan, nor that the amended plan could be crammed down.

About the time Debtors filed their amended plan, Dr. Howard began radiation treatment. By March of 2015, he had difficulty working full time. In light of Dr. Howard's health issues, Debtors no longer believed they could complete a Chapter 11 plan. On April 7, 2015, Debtors voluntarily converted the case to Chapter 7.

Debtors amended their Schedule B on June 19, 2015 to increase the value of La Cueva Properties from $1 to $50,000. The values of IF Group and Progressive Dental were unchanged.

The Chapter 7 trustee sold the Carmel Building for $1,500,000 ($425,000 net to creditors), the Howard Building for $370,000 ($328,000 net to creditors), and the Lots for $572,000 ($241,000 net to creditors). The sale prices were on the low end, but were reasonable. The estate now has about $994,000 to distribute to unsecured creditors, before the payment of administrative expenses. This compares very favorably to the amended plan's proposal to pay unsecured creditors $246,000—or even to $600,000, if the monthly payment had been negotiated up to $10,000—over five years.

The Firm filed its first and final fee application on May 12, 2015, seeking fees and costs of $61,678. The fees and expenses are broken down as follows:[9]

| Service | Hours | Fees | Expenses | Total, with taxes |
|---------|-------|------|----------|-------------------|
|         |       |      |          |                   |

---

[9] The amounts were calculated from the Firm's billing statements. Work performed before December 15, 2014 was credited to the original plan and disclosure statement. Worked performed on or after that date was credited to the amended plan and disclosure Statement. The Court finds that December 15, 2014 is the appropriate cutoff for work done on the plans.

-6-

| Chapter 11 Administration | 44.3 | $10,411 | $584 | $11,723 |
| First Plan and Disclosure Statement | 22.4 | $20,642 | None | $22,087 |
| Second Plan and Disclosure Statement | 19.8 | $10,957 | None | $11,723 |
| Claims Administration | 39.7 | $8,489 | $0.30 | $9,083 |
| Operating Reports | 27.5 | $3,269 | None | $3,497 |
| Stay Proceedings | 1.6 | $460 | None | $492 |
| 341 Meeting | 5.5 | $1,230 | None | $1,316 |
| Fee Application | 10.8 | $1,569 | None | $1,757 |
| | | | | |
| Total | 259 | $57,025 | $662 | $61,678 |

The UST objected to the application in its entirety, arguing that the services were not necessary or beneficial to the estate. The UST asserted Debtors did not have a legitimate Chapter 11 purpose from the start, and that both plans were patently unconfirmable.

## II.    DISCUSSION

A.    Section 330(a).

Attorney compensation in Chapter 11 cases is governed by 11 U.S.C. § 330(a). To be compensable, the fees must be for services that were "actual" and "necessary." § 330(a)(1)(A). If the services pass that test, then the fees for those services must be "reasonable." *Id. See also In re Lederman Enterprises, Inc.*, 997 F.2d 1321, 1323 (10th Cir. 1993). Section 330(a) is unclear in some respects; courts have struggled, for example, to determine what "necessary" services are. As the case law has developed in the Tenth Circuit, the following rules have emerged:

- "[A]n element of whether the services were "necessary" is whether they benefited the bankruptcy estate." *Lederman*, 997 F.2d at 1323.
- "'Benefit' to the estate is measured by considering whether the services were necessary to the administration of, or beneficial toward the completion of, a case under [title 11]." *In re Schupback Investments, LLC,* 2014 WL 6680122, at *8 (10th Cir. BAP 2014).
- The appropriate time for measuring benefit to the estate is when the services are provided, not when the fee application is heard. *Id.*; *In re Kitts Development*,

-7-

474 B.R. 712, 720 (Bankr. D.N.M. 2012); *In re Macco Properties, Inc.,* 540 B.R. 793, 868 (Bankr. W.D. Okla. 2015).

- Benefit is not measured solely by success; work done that had a reasonable chance of succeeding is "necessary" even if it is not successful ultimately. *Schupback Investments*, 2014 WL 6680122, at *8; *Kitts Development*, 474 B.R. at 721.
- A proposed plan does not have to be facially confirmable to benefit the estate. *In re Berg,* 268 B.R. 250, 260 (Bankr. D. Mont. 2001). Instead, there must be some "realistic hope of confirmation" after negotiating with creditors. *In re Universal Factoring, Co., Inc.,* 329 B.R. 62, 79 (Bankr. N.D. Okla. 2005).
- Even though *Lederman* states that "benefit" is only *an* element of "necessary," it is by and large the only element courts discuss. If a service benefitted the estate, courts conclude that the service was necessary, and the inquiry ends there.
- The applicant has the burden of proving its services were actual and necessary, and its fees reasonable in amount. *In re Commercial Financial Services, Inc.,* 427 F.3d 804, 811 (10th Cir. 2005); *Kitts Development,* 474 B.R. at 720.

B. Were the Firm's Services Necessary?

The only significant dispute at trial was whether the Firm's services benefited the estate and therefore were necessary.[10] The UST asserts the services provided no benefit because the Firm knew as early as the first meeting of creditors that Debtors could never confirm a Chapter 11 plan, and that both proposed plans were patently unconfirmable.

    1.    Services Leading Up to the Original Plan. This case presented a challenge to Debtors' counsel: an aggressive creditor controlled the unsecured class, and Debtors wanted to keep non-exempt property while paying the creditor substantially less than 100%. In the Tenth Circuit, the absolute priority rule means that individual Chapter 11 debtors cannot keep non-exempt property unless creditors accept the plan or the plan provides for payment in full. *In re Stephens,* 704 F.3d 1279 (10th Cir. 2013).

---

[10] The UST also argued that a portion of the fees were not reasonable. That objection is discussed below.

Notwithstanding the challenge, the Court finds that the Debtors had a chance to reorganize. Dr. Howard was in good health on the petition date, able to earn between $30,000-$50,000 per month. Debtors had at least $500,000 in exempt retirement funds that could be used to buy back non-exempt assets and/or fund a plan. Debtors had a reasonable chance of negotiating an agreement with their unsecured creditors to pay a substantial dividend and keep some or all of their LLCs.

FFCU's e-mail stating it would vote against any plan if Debtors did not obtain independent appraisals of their properties does not, as the UST asserts, indicate a hopeless cause. Finding that reorganization efforts are hopeless because a creditor threatens to oppose confirmation could discourage attorneys from representing debtors in many cases. *See Kitts Development,* 474 B.R. at 723 (discussing the chilling effect an overly strict standard would have). The Court concludes that the Firm's services leading up to the first plan and disclosure statement were necessary.

2. The Original Plan and Disclosure Statement. It was clear that unless the unsecured creditors accepted Debtors' original plan, it could not be confirmed. That is not fatal to a fee application. Many plans contain terms favorable to the debtors and involve negotiation. Many cannot be "crammed down" without amendment. Based on Debtors' income and assets, it was not clear that negotiation was going to fail when the original plan and disclosure statement were filed. The fees charged for the plan and disclosure statement therefore were necessary.

3. The Amended Plan and Disclosure Statement. By the time the amended plan and disclosure statement were filed, however, it should have been obvious that Debtors needed to make meaningful concessions to get FFCU's vote or "cram" the plan down. Debtors did not do so. Instead, they proposed a plan that was substantially similar to the original plan, but

-9-
Case 14-11297-t7    Doc 239    Filed 03/03/16    Entered 03/03/16 17:25:14 Page 9 of 13

with sale terms that were patently unacceptable. The sale terms appear to be an attempt to retain non-exempt property without paying creditors for it, since all of the property could simply be taken off the market after 90 days and retained.

Based on the amended plan terms and their dealings with FFCU, there was no chance Debtors could have settled with FFCU based on the amended plan. Because of that, the Court concludes that the amended plan and disclosure statement were not necessary.

The Court is not entirely unsympathetic to the Firm in this situation. It is natural for lawyers to want to achieve the best result for their clients, and often it is difficult to balance the client's interests with those of the estate in an individual Chapter 11 case. Similarly, the Court is not suggesting that attorneys risk their fees any time they refuse to accommodate an obstreperous creditor. Nevertheless, under the circumstances of this particular case, and in light of the interests and positions of these particular parties, the amended plan and disclosure statement were unnecessary. The related fees ($11,723) therefore are not compensable under § 330(a).

    4.    <u>Other Services</u>. Although the plan and amended plan were the main focus at trial, the UST objected to the Firm's fee application in its entirety. After reviewing Attorney's billing statements and hearing the evidence, the Court finds that the remaining services not addressed above (such as Chapter 11 administration, claims administration, operating reports, etc.) were necessary.

    C.    <u>Were the Fees for Necessary Services Reasonable</u>?

The UST also argues that the Firm's fees were unreasonable. "[B]ankruptcy court[s] must consider the § 330(a)(3) and *Johnson* factors in evaluating whether a proposed fee amount is reasonable…" *In re Market Center East Retail Property, Inc.*, 730 F.3d 1239, 1249 (10th Cir.

2013). This is true for contingent and fixed fee arrangements. *Id.* In applying the factors, the Court may draw on its own experience about the case and customary rates. *In re Weaver,* 2011 WL 867136, *3 (Bankr. D.N.M. 2011).[11]

Having disallowed fees for the amended plan and disclosure statement, the Court must assess the reasonableness of the fees charged for the remaining services ($49,955), which have been found to be necessary. The Court weighs each *Johnson*/§ 330(a)(3) factor as follows:

| § 330(a)(3) Factor | Discussion |
|---|---|
| | |
| (a)(3)(A) Time spent | Attorneys spent 239.2 hours on the necessary services. This amount of time spent is reasonable for the case. |
| (a)(3)(B) Rates charged | The rates charged - $300 for Attorney and $200 for his associates – are reasonable and customary for attorneys in New Mexico with their level of experience. |
| (a)(3)(C) Necessary/beneficial | As discussed in detail above, the services were beneficial at the time they were rendered. |
| (a)(3)(D) Timeliness | The record indicates that the services were performed timely. |
| (a)(3)(E) Skill/experience | Attorney is New Mexico certified bankruptcy specialist. The Firm is well known in the field. Attorney is very skilled and experienced in representing debtors in possession. |
| (a)(3)(F) Customary compensation in non-bankruptcy cases | Based on the Court's experience, the fees are consistent with the customary compensation charged by practitioners in non-bankruptcy cases. |
| *Johnson* Factors | Discussion |

---

[11] *See also Smith v. Freeman,* 921 F.2d 1120, 1122 (10th Cir. 1990) (in assessing fees, "[a] district judge … may …turn to her own knowledge to supplement the evidence") (quotations omitted); *Case v. Unified School Dist. No. 233, Johnson County, Kan.,* 157 F.3d 1243, 1257 (10th Cir. 1998) ("Only if the district court does not have before it adequate evidence of prevailing market rates may the court, in its discretion, use other relevant factors, including its own knowledge, to establish the rate."); *In re Recycling Industries, Inc.*, 243 B.R. 396, 404 n. 6 (Bankr. D. Colo. 2000) (When there is no evidence of prevailing market rates, the court "may use other relevant factors, including its own knowledge, to establish the rate.") (citation omitted); *In re Lady Baltimore Foods, Inc.*, 2004 WL 2192365 (Bankr. D. Kan. 2004) (A court "may also use its own knowledge and experience in determining reasonableness.").

| | |
|---|---|
| Time and labor required? | This factor is more applicable to contingent fee cases. The time spent was reasonable, all things considered. |
| Novelty and difficulty of the questions? | The case did not present novel or difficult legal questions. The difficultly was in trying to negotiate a deal with FFCU and its counsel. |
| Skill requisite to perform the legal service properly? | The case required an attorney skilled in Chapter 11 cases, and with the ability to negotiate effectively. Attorney has those skills. |
| Preclusion of other employment due to acceptance of the case? | It is unclear whether this case precluded other employment. Since Attorney was billing hourly, this factor is not particularly applicable. |
| Customary fee? | The fee is customary for a case of this size and complexity. |
| Whether the fee is fixed or contingent? | The hourly rates charged by Attorney and his associates were fixed. |
| Time limitations imposed by the client or circumstances? | There is no evidence of time limitations. The Firm provided services in a timely fashion. |
| Amount involved and results obtained? | Debtors had to deal with about $5 million of debt, which is fairly large for a New Mexico individual Chapter 11 case. Debtors did not reorganize under Chapter 11. |
| Experience, reputation, and ability of the attorneys? | Attorney and the Firm are very experienced and have good reputations as debtor in possession counsel. |
| Undesirability of the case? | This factor is more applicable to contingent fee cases. The case was challenging. There was substantial animosity between Dr. Howard and FFCU. |
| Nature and length of professional relationship with the client? | This factor does not apply to Chapter 11 DIP counsel. |
| Awards in similar cases? | A fee award of $50,000 is consistent with awards in cases involving a high amount of debt, active creditors, and various non-debtor entities. |

Most factors weigh in the Firm's favor or do not apply. After weighing all the factors, the Court concludes the fees for the remaining services are reasonable.

D.     Paralegal Fees.

Finally, the Firm asks the Court to rule on whether it can charge paralegal time for filing documents using the Court's electronic filing system, CM/ECF. The question is a fair one, but the

-12-
Case 14-11297-t7    Doc 239    Filed 03/03/16    Entered 03/03/16 17:25:14 Page 12 of 13

UST did not object to the fee application on these grounds and takes no position on the matter. The Court therefore declines to rule on the matter.

IV. <u>CONCLUSION</u>

Debtors and their counsel took aggressive positions in this case. That is fine. At some point, however, they should have realized that no plan could ever be confirmed unless they made meaningful concessions to the controlling unsecured creditor. The amended plan and disclosure statement were drafted and pursued after this point, and therefore were not necessary. The remaining fees ($49,955) were charged for necessary services and are reasonable in amount. A separate order will be entered.

_____
Hon. David T. Thuma
United States Bankruptcy Judge

Entered: March 3, 2016

Copies to:

William F. Davis
6709 Academy NE, Suite A
Albuquerque, NM 87109

Leonard K. Martinez-Metzgar
P.O. Box 608
Albuquerque, NM 87103-0608